**UNITED STATES of America,**
**Appellee,**

v.

**Michael PATRISSO and Simon Mankes,**
**Appellants.**

**No. 101, Docket 25194.**

United States Court of Appeals
Second Circuit.

Argued Oct. 22, 23, 1958.

Decided Dec. 22, 1958.

William K. Zinke, Asst. U. S. Atty. for Southern District of New York, New York City (Arthur H. Christy, U. S. Atty. for Southern District of New York, George I. Gordon, Asst. U. S. Atty. for Southern District of New York, New York City, on the brief), for appellee.

David Markowitz, New York City, for appellant, Michael Patrisso.

Charles Sutton, Brooklyn, N. Y. (George W. Herz, Jamaica, N. Y., on the brief), for appellant, Simon Mankes.

Before SWAN and MOORE, Circuit Judges, and KAUFMAN, District Judge.

MOORE, Circuit Judge.

The defendants Michael Patrisso and Simon Mankes appeal from judgments of conviction entered upon verdicts of guilty after a jury trial. Patrisso was convicted of conspiring to possess and transport merchandise moving in interstate commerce knowing it to have been stolen (18 U.S.C.A. § 371) (Count I of the indictment); Mankes of possessing such merchandise knowing it to have been stolen (18 U.S.C.A. § 659) (Count III of the indictment). The indictment contained six counts; Count I charged a conspiracy by Michael Patrisso, Edward Ellis, Monroe Postrel and Simon Mankes with others unknown to violate section 659; Count II related only to Monroe Postrel and charged possession; Count III was similar to Count II naming Simon Mankes; Count IV was similar naming Edward Ellis; Count V charged Edward Ellis with interstate transportation; and Count VI made a similar charge against Monroe Postrel. During the trial Ellis pleaded guilty to Counts I and IV, Count V being severed. Thereafter and also during the trial Postrel pleaded guilty to Count II. At the end of the government's case the court granted Mankes' motion for judgment of acquittal of the conspiracy charge (Count I) but denied the motion as to possession (Count III). Patrisso's motion to dismiss as to conspiracy was denied. The cases, therefore, must be reviewed as to sufficiency of proof and for trial errors against a somewhat similar factual background but with quite different legal principles applicable.

On February 3, 1953 a valuable truck load of some 250,000 Sylvania television tubes being driven from the Sylvania plant at Emporium, Pennsylvania was hijacked in New York City. The charges against Patrisso and Mankes arise out of the possession, sale and interstate transportation of tubes alleged to have been thus stolen.

### The Conspiracy Case Against Patrisso

Patrisso was implicated by his co-conspirator Ellis who, after changing his

not-guilty pleas to guilty during the trial, became a government witness. Ellis testified, in substance, that he started to buy tubes from Patrisso in the early part of 1953, that he went to see Patrisso and a friend (Murray Cohen) in New Jersey, and that "[T]hey showed me a list of tubes" which "come from the Sylvania deal" and "was a hijacked load of Sylvania tubes, and that was a part of them." After some discussion as to price (30 cents being finally agreed upon) Ellis picked out 30,000 to be delivered when Patrisso should let him "know as soon as they [the tubes] got there." During the same general discussion between Ellis, Patrisso and Cohen it was revealed that Patrisso and Cohen were to pay 19 cents and split the 11 cents profit between them. About two weeks thereafter Ellis obtained around 2,500 tubes from Patrisso in New Jersey, and as to the place of intended resale "just told him New York." A week or so later Ellis picked up about 1,600 additional tubes from Patrisso. Both lots (2,500 and 1,600) he sold to Postrel for 45 cents a tube.

██ There can be no doubt, if the jury chose to believe Ellis, that Patrisso, together with Ellis and Cohen, entered into a plan whereby Cohen and Patrisso were to obtain Sylvania tubes from the hijacked shipment and sell them to Ellis for interstate transportation to New York and that the tubes were delivered to Ellis, Patrisso knowing of Ellis' intentions that the tubes were to be sold by him in New York. The overt acts pleaded and proved occurred in New York, thus satisfying jurisdictional requirements, 18 U.S.C.A. § 3237; Hyde v. United States, 1911, 225 U.S. 347, 356–367, 32 S.Ct. 793, 56 L.Ed. 1114; United States v. Cohen, 3 Cir., 1952, 197 F.2d 26; Ladner v. United States, 5 Cir., 1948, 168 F.2d 771, certiorari denied 335 U.S. 827, 69 S.Ct. 53, 93 L.Ed. 381. These facts rebut Patrisso's argument that a conspiracy was not proved.

██ Patrisso next argues that the tubes sold were not identified as being a part of the hijacked lot and that he did not know of the hijacking, that the tubes were stolen, or that interstate commerce was involved. These contentions are at variance with Patrisso's statement to Ellis as to the source of the tubes and his knowledge of their destination. The other errors assigned, i. e. unlawful joinder of the defendants and delay in bringing the case to trial, lack merit. Joinder was proper as a matter of law and there was no proof that the delay was prejudicial. The judgment as to Patrisso should be affirmed.

### The Possession Case Against Mankes

Mankes was acquitted of conspiracy (Count I) and convicted solely of possession (Count III). The indictment under 18 U.S.C.A. § 659 charges that on or about May 10, 1953 Mankes had in his possession Sylvania television tubes, "knowing the same to have been stolen." Assuming that the proof was sufficient to establish that the tubes possessed by Mankes on that date were taken from the hijacked truck, the essential element of the crime is Mankes' knowledge that the tubes had been stolen.

There is no dispute as to the chain of title. Ellis, Patrisso and Cohen knew that the tubes had come from the hijacked truck. Ellis purchased the tubes from Patrisso. Mankes was not present on that occasion. Ellis sold the tubes to Postrel. Mankes was not a participant in that transaction. Postrel then sold 1,000 of the tubes to Mankes. Postrel pleaded guilty to a possession count and became a witness for the government. His testimony that, when he obtained the tubes from Ellis, he did not know they were stolen and had no knowledge that they had been stolen when he delivered them to Mankes on May 10, 1953, appears most credible. Had Postrel any knowledge of the theft which he had imparted to Mankes it surely would have been in his interest to so testify if he hoped to gain favor and leniency from the court for his cooperation.

The government's case against Mankes depends upon a series of inferences. The accumulation of instances during the trial in which testimony inadmissible

against Mankes was received against others with instructions that it was not to be considered as to Mankes could have been highly prejudicial to Mankes. The accumulative effect of this testimony leads to the conclusion that he did not have a fair trial. This conclusion iš not based on any lack of solicitude for Mankes' rights on the part of the trial judge or on error in his instruction to the jury. Both during the trial and in his charge as to the limitations which the jury should place upon the proof the court admonished that certain damaging testimony should not be considered against Mankes. To illustrate, testimony from Postrel that he knew the tubes were stolen was received over objection that it was incompetent and highly prejudicial as against Mankes. The trial court, in so ruling, said it was only Postrel's knowledge and not the knowledge of any other defendant. However, when the testimony was given Postrel had already pleaded guilty. Since proof of Postrel's knowledge was unnecessary to convict Postrel this testimony was clearly academic as to him and inadmissible against Mankes.

The jury requested a reading of Postrel's testimony more than three hours after it had retired, and at the same time asked to hear again the court's charge as to Mankes (SM 715–716). The jury also requested the date of Postrel's first conversation with Mankes after Postrel's release from custody by the F. B.I. (SM 720). The court had charged that Mankes could not be found guilty unless he knew the tubes to have been stolen at the time when he acquired them from Postrel (SM 702), but the conversation which the jury was concerned with took place at least three weeks later.

In spite of the court's statement that Postrel's knowledge could not be considered proof of Mankes' knowledge, the jury might well have drawn inferences from Postrel's testimony which were substantially prejudicial to Mankes.

Almost every criminal case against multiple defendants creates difficult trial problems. Here the trial started against four defendants. During the government's case the liberal rules for admission in evidence of testimony against alleged co-conspirators applied. The jury heard all this evidence. The jury knew that Ellis and Postrel had changed their not-guilty pleas and had admitted that they knew the tubes had been stolen. Although the government argues that Ellis' admission of knowledge that the tubes were stolen was restricted to Patrisso, this argument scarcely applies to the admission of Postrel's knowledge. Postrel's plea of guilt carrying with it the inference that he knew that the tubes which he possessed on May 17, 1953 were stolen is not proof that Postrel knew that the tubes delivered to Mankes on May 10 were stolen or that he intimated this fact or suspicion to Mankes.

There being insufficient proof to connect Mankes with the conspiracy, he was acquitted. Thus the very basis for the admission of the proof as against Mankes was destroyed. However, there was no way to obliterate the proof from the minds of the jury. In a most able charge the trial judge attempted to do so but Mankes' conviction upon the scanty proof properly applicable to him is indicative that the atmosphere created against Mankes was too strong to be overcome by mere instructions.

The government in its endeavor to establish guilty knowledge is forced to argue that Mankes must have had guilty knowledge because everybody in the trade, including Mankes, knew of the hijacking. The logical conclusion, therefore, would be that anyone who purchased Sylvania tubes subsequent to February 3, 1953 did so at his peril and was subject to being accused of violating 18 U.S.C.A. § 659. Next, the government points to Mankes' "surreptitious handling of stolen goods" as a circumstance from which guilty knowledge may be inferred (Government Brief, p. 28). The facts do not justify this characterization. Mankes testified that he became suspicious on June 1, 1953, after talking to two of Postrel's employees, that the Postrel tubes might have been stolen. Later that

day two F.B.I. agents called on Mankes at his home. From there they all went to Mankes' store. There was no effort made to remove or conceal any tubes before the agents arrived. Instead, various Sylvania tubes were segregated at the store so that the agents could inspect them the next day. No one appearing on June 2, Mankes removed the tubes to his garage. He claimed that his reason for the removal was to avoid inspection in his store. The reason is unimportant. Since the agents knew of the existence of the tubes on June 1, the removal was scarcely an act of concealment. Yet despite the fact that the subject matter of the crime was the possession of stolen tubes the government made no effort to seize any of the tubes or to offer any tubes in evidence. There appears to have been no follow up of the inspection project. Mankes kept these tubes for three years, first in his garage, and later in his house. During this period no demand was made by the government to examine them. After three years had elapsed Mankes, on advice of counsel, disposed of the tubes. These facts as to the physical disposition of the tubes do not support even an inference of "surreptitious handling."

██ The government also relies upon a "low price" for the tubes as justifying an inference of guilt. In contrast to proof that Mankes had purchased tubes at prices ranging from 20 cents to 48 cents, the government introduced proof from the three other defendants as to price. Postrel's conclusion that 45 cents was substantially lower than the available price was inadmissible and prejudicial. The government was required to prove Mankes' guilty knowledge, not that of his co-defendants.

██ In summary, the admission of testimony as to Ellis' and Postrel's knowledge that the tubes were stolen, with such incidents as the failure of Ellis to give Postrel an invoice (thus implying that Postrel's failure to give Mankes an invoice evidenced a similar transaction with equally guilty knowledge), together with the admission of proof applicable to Patrisso, Ellis and Postrel and not to Mankes, all created a situation which no charge could effectively cure.

The judgment against Patrisso is affirmed. The judgment against Mankes is reversed and the case remanded for a new trial.